J. S58042/18 & J. S58043/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.L.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: R.A.G., FATHER | : | |
| | : | No. 796 WDA 2018 |

Appeal from the Decree, May 1, 2018,
in the Court of Common Pleas of McKean County
Orphans' Court Division at No. 42-17-0138

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.R.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: R.A.G., FATHER | : | |
| | : | No. 797 WDA 2018 |

Appeal from the Decree, May 1, 2018,
in the Court of Common Pleas of McKean County
Orphans' Court Division at No. 42-17-0139

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: R.A.G., FATHER | : | |
| | : | No. 798 WDA 2018 |

Appeal from the Decree, May 1, 2018,
in the Court of Common Pleas of McKean County
Orphans' Court Division at No. 42-17-0140

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.L.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: M.G., MOTHER | : | |
| | : | No. 808 WDA 2018 |

J. S58042/18 & J. S58043/18

Appeal from the Decree, May 1, 2018,
in the Court of Common Pleas of McKean County
Orphans' Court Division at No. 42-17-0138

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.R.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: M.G., MOTHER | : | |
| | : | No. 809 WDA 2018 |

Appeal from the Decree, May 1, 2018,
in the Court of Common Pleas of McKean County
Orphans' Court Division at No. 43-17-0139

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.M.G., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.G., MOTHER | : | No. 810 WDA 2018 |

Appeal from the Decree, May 1, 2018,
in the Court of Common Pleas of McKean County
Orphans' Court Division at No. 42-17-0140

BEFORE:  OLSON, J., MURRAY, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED SEPTEMBER 24, 2018**

R.A.G. ("Father") and M.G. ("Mother") appeal from the May 1, 2018 decrees entered in the Court of Common Pleas of McKean County, Orphans' Court Division, involuntarily terminating their parental rights to their dependent children, A.L.G., male child, born in May 2010; A.R.G., female child, born in January 2013; and M.M.G., female child, born in October 2005

- 2 -

(collectively, "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). We have consolidated Father's and Mother's appeals **sua sponte**. After careful review, we affirm.

The orphans' court set forth the following:[1]

> McKean County Children and Youth Services (hereinafter ["CYS"]) filed [] Petition[s] to Involuntarily Terminate the Parental Rights of [Mother] and [Father] to [A.L.G., A.R.G., and M.M.G.] After several days of hearings and at the commencement of proceedings on April 6, 2018, Mother, through counsel, indicated that she wished to involuntarily relinquish her parental rights. Mother filed a Petition to Voluntarily Relinquish Parental rights and a full colloquy was conducted. However, since the petition cannot be made final until at least 10 days after it is acknowledged[,] further hearing was scheduled for April 27, 2018. Mother appeared at the April 27, 2018 hearing and indicated that she wished to withdraw her voluntary relinquishment. The record is now closed and this Memorandum addresses the request to involuntarily terminate Father's and Mother's parental rights.
>
> . . . .
>
> The initial hearing to address the termination petition was scheduled for January 5, 2018. Parents had notice of that hearing. All parties were present and ready to proceed except for Parents. Parent[s'] counsel advised the court that Mother had an accident the night prior to the hearing and had been transported to the emergency room of the Kane Community Hospital for treatment. It was indicated

---

[1] On May 1, 2018, three separate opinions were filed, one for each child. The majority of the following recitation of the procedural history and facts of the case was taken from the orphans' court opinion for A.L.G. Where the narrative differs regarding facts specific to A.R.G. and M.M.G., pertinent information was inserted from the orphans' court opinions for each child. The instances where these insertions occur are clearly noted.

that she that she [sic] had fallen and struck her head. It was also indicated that Father had gone to the hospital to assist Mother and to provide her transportation back to their residence in Mount Jewett, PA; and, neither Parent had obtained much sleep. Counsel requested a continuance of the hearing. The court granted the request for a continuance but indicated that Parents had 10 days to provide medical documentation to the court that verified that Mother did need/receive medical care and that it would have been difficult for her to appear for the January 5, 2018 hearing. No medical documentation has been provided and the court, therefore, finds that Parents had no valid reason for failing to appear for the January 5, 2018 hearing. However, it was established at the January 12, 2018 hearing that Parents had been consuming alcohol the night prior to the January 5, 2018 hearing. It was in the process of consuming alcohol that Mother fell and hit her head and an ambulance was called.

The consumption of alcohol by the Parents on January 4, 2018 is very troubling as they are both prohibited from doing so. Father has an extensive prior criminal record and he is currently on 5tate [sic] Parole. It is a condition of his parole that he not consume alcohol or have any alcohol at his residence. He has had prior parole violations for consuming alcohol while on supervision. In 2017[,] he was personally transported by his parole officer to an inpatient treatment facility in Erie to address his frequent alcohol consumption. The reunification plan in the dependency case also mandates that Father and Mother consume no alcohol and they are to follow their drug and alcohol treatment plans. Christina Mitchell, a drug and alcohol treatment specialist, testified that she was the treatment specialist assigned for Mother and Father. She testified that they each missed numerous appointments. Father was unsuccessfully discharged from treatment and Mother "chose to be discharged" from treatment in April of 2017.

Mother also has a prior criminal record. She was required as part of her most recent period of supervision (which has now expired) to refrain from drinking alcohol and to complete drug and alcohol treatment.

On February 22, 2018[,] Father appeared for a termination hearing intoxicated. His parole agent took him into custody after the hearing commenced and he was required to attend an inpatient treatment facility at "Maple Manor." He completed that program and was discharged on March 26, 2018. He asserts that his previous inpatient treatment "was a joke" but he benefitted from the Maple Manor Program.

Father's alcoholism has put the [C]hildren's safety directly at risk. In 2014[,] he was driving while intoxicated with the [C]hildren in the car. He was convicted of DUI Highest Rate of Alcohol and Endangering the Welfare of Children; and, sentenced to 1 to 5 years [of] confinement as he had prior DUI convictions. The fact that Father was on supervision for a prior DUI offense that occurred when his [C]hildren were in the car and then he showed up intoxicated for a termination hearing involving those same [C]hildren reflects the unbreakable grip that his alcohol addiction has on him. Despite the high risk of his parole being violated again for alcohol consumption and the negative effect in the termination proceedings[,] he drank a substantial amount of alcohol and then came to court.

The court specifically finds that both Mother and Father have a long history of drug and alcohol addiction which they have little or no personal motivation to address – and this pattern will likely continue indefinitely into the future. The incidents on January 4, 2018 and February 22, 2018 reflect that the [P]arents' alcohol addiction is becoming more, not less, severe. Knowing that Father could be facing revocation and confinement and knowing that they had a hearing the following day regarding termination of their parental rights, they none-the-less drank to the point that emergency personal [sic] responding to

the scene concluded "that they (Parents) seemed to be intoxicated on something."

There were other concerns in Parent[s'] home on January 4, 2018. Parents were utilizing a fireplace for heat and the first responders were extremely concerned, based on the ashes and debris that had spilled out of the fireplace and onto the floor[,] that the structure could/would catch on fire. One first responder indicated that, if there were children in the home when they had responded, they would have felt compelled to report the incident to appropriate child welfare authorities.

Father testified that he and Mother have resided together since shortly after Mother's paramour, [C.F.], went to jail in 2015 for physically abusing [A.L.G.] and Father was released from his period of state incarceration for, in part, driving intoxicated with the [C]hildren in the car. However, Father also testified that he and Mother have not been involved in a relationship for years. He indicated that they reside together "for the kids." He did testify that, despite not being in a relationship, he loves Mother and enjoys "sitting on the couch with her and cuddling for hours."

[The Children] have been in placement since November 19, 2015. Therefore, for over two years [CYS], the court and service providers have attempted to work with Parents to improve conditions to the point that the [C]hildren could safely be in Parents' care and custody. When the [C]hildren were initially placed[,] Father was incarcerated in a State Correctional Facility. He was facing charges for Driving Under the Influence and Endangering the Welfare of a Child(ren). He was subsequently convicted at [] CR 2015 (McKean County) of both of these and additional counts. He was sentenced to a State period of confinement. Again, it is a condition of his sentence that he consume no alcohol and be in no place where alcohol is served and sold. He was also ordered to follow his drug and alcohol treatment plan.

In November of 2015[,] Mother was also incarcerated. She was also facing a charge of Endangering the Welfare of a Child. The victim of that count was [A.L.G.] She was eventually convicted of one count of Endangering the Welfare of a Child (victim being [A.L.G.]) and sentenced to not less than 4 months to no more than 11½ months. The facts that support this conviction are: In November of 2015[,] Mother was residing with her then paramour, [C.F.,] and her [C]hildren in Bradford, PA. At that time[,] [A.L.G.] was attending elementary school in Bradford. School staff observed bruising on [A.L.G.'s] body. Lisa Dunkle, a CYS caseworker, responded to the school. She observed sever[e] bruising on [A.L.G.,] particularly in the buttock area. It was black and purple. It was evident that he had been extremely beaten likely with some item. [A.L.G.] was then transported to the Bradford Regional Medical Center where this extreme bruising was medically documented. At the hospital[,] [C.F.] admitted to caseworker Dunkle that he "had spanked him ([A.L.G]) because he was bad all the time and that is all he responds to." Mother admitted to a CYS caseworker that she was aware that [C.F.] had, as in recently and on other previous occasions, inflicted corporal punishment on [A.L.G.] She explained that she is present when [C.F.] "spanks" [A.L.G.] and she was present for the November 2015 assault. She explained the [sic] [C.F.] "starts out with his hand and then proceeds to using a belt." Mother justified these assaults by asserting that she herself was spanked and "this is all [A.L.G.] responds to." Therefore, Mother not only prevented [sic] her paramour from physically beating and bruising [A.L.G.,] she encouraged it. Mother also attempted to downplay the harm/injury to [A.L.G.] She told Bradford City Police Officer Linda [C]lose that she "only saw one small bruise" and later indicated that she "saw nothing (regarding injury)." Officer Close, who has decades of experience as a police officer, indicated that "this is not the first time that I have seen injuries. There have been many incidents – but this is one of the cases that stuck with me." [M.M.G.] indicated that she had also been struck with a belt by [C.F.] Mother initially

indicated that she was not going to discontinue her relationship with [C.F.,] and she planned on cohabitating with him and the [C]hildren after they were both were [sic] released from incarceration ([C.F.] was subsequently convicted of criminal offenses that arose form [sic] beating [A.L.G.]). She sent letters to him while he was incarcerated indicating that she wanted to be back with him and "have your baby." However, her position subsequently changed. She resumed her relationship with Father when he was released from incarceration. The two of them have resided together for most of the time since the dependency case was initiated in in [sic] November of 2015. However, their relationship is unstable and they have separated at times.

The use of excessive corporal punishment, specifically beating [A.L.G.] with a belt, has caused emotional injury to all of the [C]hildren. [M.W., M.M.G.'s foster mother,] testified (testimony the court finds credible) that when her husband walked into a room with a belt[,] [M.M.G.] ran away in fear and hid from them. She was shaking and they had to assure her that they would never utilize a belt to discipline her.

Although Father was incarcerated when the [C]hildren were abused by Mother's paramour[,] Mother's prior actions and inaction still have bearing regarding the request to terminate Father's Parental Rights. As indicated elsewhere in these facts[,] Father continues to reside with Mother "for the kids." Although Father claims he has no active romantic relationship with Mother[,] the two of them have a pattern of being together when Father is not incarcerated. Father has had periods of employment in the past[,] and the children were in Mother's sole care when Father was working. Therefore, it is likely the [C]hildren would be in Mother's care in the future if they were ever placed back into Father's care.

There was some initial cooperation from Parents following the November 2015 finding of dependency. Parents were attending medical appointments and

staying in contact with the [C]hildren. However, in a June 2016 finding in the dependency case[,] it was indicated that Parents were only minimally working with the Parents as Teachers Program, which was a major component of the reunification plan. A finding was also made that Parents had once again been evicted and had no definite plans regarding housing. Mother and Father had also recently separated. Mother was still having contact with [C.F.,] and there was evidence that she intended on continuing/renewing her relationship with him despite the abuse that he had inflicted on [A.L.G.] Father had missed many of his Drug and Alcohol treatment appointments and was on the verge of being discharged from treatment.

Findings following the August 16, 2016 review hearing were more positive. Parents had reconciled again and they were each following their drug and alcohol and mental health treatment plans.

By the time of the October 25, 2017 review hearing[,] Parents' progress had again declined. They had separated yet again. Their participation in the Parents as Teachers program had fallen off. Father was residing with another female and Mother was homeless. Parents had previously obtained mental health evaluations but were not attending their mental health treatment appointments.

It was found at a January 25, 2017 review hearing that Parents were still not following their mental health treatment plan. They hadn't re-engaged since the January 25, 2017 hearing even though they had been ordered, as part of the reunification plan, to do so. Mother had new criminal charges and Father had two positive drug screens (positive for illegal substances) since the last hearing. Father had re-engaged in Drug and Alcohol treatment. Parents still did not have available housing and they had made minimal efforts to obtain appropriate housing for the [C]hildren.

At a May 10, 2017 review hearing[,] it was found that [P]arents had, in the past few days before the hearing, obtained housing. However, Father was still not engaged in mental health treatment and neither Parent was working with the Parents as Teachers Program. Father was missing his drug and alcohol appointments again.

Parents have a horrible history regarding housing. They have repeatedly requested housing assistance, obtained housing, failed to pay rent and damaged the property which resulted in many, many evictions. They have had substantial judgments entered against them by different landlords. CYS presented documentation of 9 different judgments from 9 separate landlords totaling $12,488.36.

Parents have also submitted false information in the past to obtain housing assistance. Linda Thompson from the McKean County Redevelopment Authority, the department that oversees many public housing programs in McKean County, testified that due to their negative history[,] there is [sic] no current housing assistance options for the Parents. Parents have made appointments with her organization and "no showed" on numerous occasions. She explained that, even if assistance was [sic] available, it is very unlikely that any landlords in McKean County would be willing to rent to Parents due to their well-known and negative rental history. She has attempted to work with Parents to develop a plan to re-pay past due rent/judgments but Parents failed to show up for appointments.

Rebecca Plummer, the Director of the Christian Ministry in Bra[d]ford, testified that her organization provided housing assistance to Parents as far back as 2011. Parents have requested assistance from the Ministry to pay of[f] their past due rent, for gas cards and for rental assistance. Parents knowingly provided false information to the Ministry and are therefore no longer eligible for assistance. In 2016[,] Parents had obtained a voucher for a one week stay at a local hotel from the Ministry. The Ministry generally only

provides a voucher for a week. After the first week[,] Mother came in and indicated that she and Father had separated when they had not. Because they believed Mother[,] they provided her with another voucher for an additional week. Then Mother and Father had a third party come in and claim to be homeless to obtain a third voucher. Mother took this voucher and forged it to make it look like it was a valid voucher for Parents. Parents' dishonesty and abuse of the Christian Ministry program forced the Ministry to make major changes to their operating procedures.

Parents have also attempted to conceal information regarding their relocation and evictions form [sic] their caseworker. Joshua Blotzer testified that he had received information that Parents were about to be evicted from their residence and he questioned Parents about it, indicating that he and CYS maybe [sic] able to assist them in finding a new residence. Parents adamantly denied that they were being evicted. They were then evicted. Caseworker Blotzer also had difficulty obtaining required signatures form [sic] the Parents for school and treatment matters. Parents would indicate that they would sign the necessary papers but then not show up to do it. This resulted in unnecessary and harmful the [sic] delay in needed treatment for [the Children].

Father has had a consistent pattern of criminal convictions and confinement for supervision violations including: 1) McKean County [] CR 2014. Conviction for DUI Highest Rate of Alcohol, Endangering the Welfare of Children. Sentenced to 1 to 5 years [of] confinement; 2) McKean County [] CR 2012. Conviction for DUI Highest Rate of alcohol. Sentenced to 90 days to 5 years; 3) McKean County [] CR 2007. Convicted of DUI Highest Rate. Sentenced to 48 hours to 6 months; 4) McKean County [] CR 2006. Convicted of Retail Theft, 3rd or Subsequent Offense. Sentenced to 6 months of probation; 5) McKean County [] CR 2005. Convicted of Theft by Unlawful Taking. Sentenced to 5 days to 6 months; 6) McKean County [] CR 2002. Convicted of Burglary (-2). Sentenced to 30 days to 1 year. Father has had many

violations of his supervision on these convictions including being convicted of new offenses and utilizing drugs and alcohol. His current parole officer testified that Father "is found to be at a maximum level of supervision. He is frequently unemployed and has issues with drugs and alcohol." Parole Agent Shawn Hartman explained how he personally drove Father to an inpatient facility in September 2017. He received a call from McKean County Adult Probation and advised that Mother and Father had appeared for an appointment that Mother had with her county probation officer. Father was intoxicated. Agent Hartman then found alcohol containers in Parents' residence[,] and Father admitted to consuming alcohol. Agent Hartman testified that Father has repeated episodes of intoxication and alcohol possession. Father completed the inpatient treatment program in Erie (which Father has termed "a joke") but, again after that he: 1) had the incident on January 4th and 5th, 2018 where he and Mother were drinking; 2) missed many of his drug and alcohol appointments; and, 3) showed up intoxicated on February 22, 2018 for the termination hearings involving these cases. Mother was also violated for being intoxicated, etc. after she and Father showed up for her probation appointment under the influence in 2017. This lengthy pattern of criminal activity and supervision violations is likely to continue in the future and result in Father being incarcerated again.

Shannon McAndrew, a mobile mental health therapist at the Guidance Center in Bradford, is working with [A.L.G.] to address and assist him in controlling his negative behaviors [and has attempted to work with the family regarding therapy for A.L.G.[2]] The court found her testimony credible that Parents['] participation with her and her program has been poor. For example, she made contact with Mother in November of 2018 and scheduled 3 appointments to meet with [A.L.G.] and Parents. She explained to Mother that it is very important that she meet with Parents to obtain [A.L.G.'s] history. She told Mother

---

[2] Orphans' court opinion as to M.M.G., 5/1/18 at 12.

that "[A.L.G.] would not get better unless she (Mother) was involved." Parents no showed for all 3 appointments. She called Mother after each missed appointment and encouraged her to attend the next. She also offered Parents different times and dates for the appointments. Parents then stopped returning Ms. McAndrew's calls.

[A.L.G.] currently resides in the foster home of [R.H.] He had been placed there when he was initially removed from his Parents' care. He was subsequently moved to his biological aunt and uncle['s home]. He was placed with his aunt and uncle due to behavior problems he was having in [R.H.'s] foster home. Further, [R.H.] and her husband were separating and she had some personal matters to address. However, [the aunt and uncle] later advised CYS that they are not a permaencey [sic] option for [A.L.G.] Therefore, [A.L.G.] was transitioned back into [R.H.'s] foster home with his sister[, A.R.G.]

[R.H.] is now divorced and she informed CYS that she had a strong bond with [A.L.G.] and would like for him to remain in her care. [A.L.G.] is doing well in [R.H.'s] foster home. [R.H.] monitors [A.L.G.'s] behavior in school and works with school staff and service providers to assist [A.L.G.] [A.L.G.] has a productive bond with her and his sister[, A.R.G.] Shannon McAndrew, [A.L.G.'s] mobile therapist, testified that [R.H.] has made all of the appointments that she scheduled for [A.L.G.] and she reaches out to Ms. McAndrew for assistance in managing [A.L.G.'s] behaviors.

Orphans' court opinion as to A.L.G., 5/1/18 at 1-13.

[A.R.G.] currently resides in the foster home of [R.H.] [A.L.G.] also resides there. [A.R.G.] has resided there since she was removed from her Parents' care in 2015. [A.R.G.] has a very strong bond with [R.H.] [A.R.G.] is doing well in the [R.H.] foster home. [R.H.] indicated that she would adopt [A.R.G.] if that is an option. However, [A.L.G.] has had some difficulties in her home and she has not yet committed

> to adopting him. He has started a new medication regimen and is responding well. However, she wants to see a pattern of improvement before committing to adoption. She is unwilling to adopt one sibling without adopting the other. Therefore, if she decides not to adopt [A.L.G.,] she will not adopt [A.R.G.] either.

Orphans' court opinion as to A.R.G., 5/1/18 at 12-13.

> [M.M.G.] is currently in the [M.W. and J.W.] foster home. She is doing well there. The [Ws] are providing a loving home for her and have made substantial efforts to assure that her needs are met. They are very active with her care, service providers and school. They intend on adopting M.M.G. if that is an option.

Orphans' court opinion as to M.M.G., 5/1/18 at 12.

> Due to the delay that occurred from Parents' failure to timely address approval of care, medication, etc., McKean County CYS was granted legal authority to make these decisions. Services and treatment are now timely and [A.L.G.'s] behavior, although still of concern, has dramatically improved. Nevertheless, [R.H.] still has reservations about committing to the adoption. [A.L.G.'s] recent treatment has resulted in behavior improvements and there is optimism that progress will continue but this progress has not yet been for an extended period. She is hopeful that progress will continue and she would be willing to adopt [A.L.G.] and keep him in her home with [A.R.G.] but she cannot provide any guarantee at this time. This is an important factor that the court has to consider regarding whether termination of Father's parental rights would best serve his developmental, physical and emotional needs.

Orphans' court opinion as to A.L.G., 5/1/18 at 13.

> Due to the delay that occurred from Parents' failure to timely address approval of care, medication, etc., [CYS] was granted legal authority to make these

decisions. Services and treatment are now timely for [M.M.G.]

Orphans' court opinion as to M.M.G., 5/1/18 at 13.

The [C]hildren enjoy visiting Parents when they are at visits. They interact with Parents. However, when Parents miss visits[,] it is upsetting to the [C]hildren. Parents have attended many of the visits but have also missed many of them. There is a pattern of the [C]hildren's behavior declining after the visits. There have been concerns about Parents discussing inappropriate topics/information with the [C]hildren during the visits. This has greatly upset the [C]hildren. For example, during the most recent visit, Mother, while Father was present[,] "told the kids that she might not see them for a while." Mother also talked to the [C]hildren further but the case aid [sic] couldn't hear what she was saying. Since the visit was days before the termination hearing[,] it is likely that Mother discussed the possibility that her rights might be terminated with the children. This, again, greatly upset the [C]hildren and was added stress that Mother should have not [sic] exposed the [C]hildren to.

Orphans' court opinion as to A.L.G., 5/1/18 at 13.o

The record reflects that the orphans' court entered the decrees terminating Father's and Mother's parental rights to A.L.G., A.R.G., and M.M.G. on May 1, 2018. The record further reflects that on May 24, 2018, Father filed timely notices of appeal, together with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Thereafter, on May 31, 2018, Mother filed timely notices of appeal, together with Rule 1925(b) statements. On June 1, 2018, the orphans' court filed its Rule 1925(a) opinions with respect to Father's appeals wherein it referred this court to its May 1, 2018 opinions concerning termination of Father's parental

rights with respect to each of the Children and also addressed issues that Father has now abandoned. Also on June 1, 2018, the orphans' court filed its Rule 1925(a) opinions with respect to Mother's appeals wherein it referred this court to its May 1, 2018 opinions concerning termination of Mother's parental rights with respect to each of the Children.

Father raises the following issues for our review:

1. Whether the [orphans'] court erred in finding that [CYS] had proven by clear and convincing evidence that grounds for the involuntary termination of [Father's] parental rights existed when [Father] was substantially in compliance with [CYS's] reunification plan; had made efforts to correct the identified problems which led to the placement of the minor [C]hildren; when no evidence was submitted that [Father] failed or refused to perform parental duties[;] and[] when [CYS] did not otherwise prove grounds existed to terminate [Father's] parental rights?

2. Whether the [orphans'] court erred in not giving primary consideration to the effect of this termination on the development and emotional needs and welfare of the [Children] pursuant to 23 Pa.C.S.[A. §] 2511(b)?

Father's brief at 9.

Mother raises the following issue for our review:

Whether the [orphans'] court abused its discretion in finding that [CYS] produced clear and convincing evidence to support an involuntary termination of [Mother's] parental rights[?]

Mother's brief at 9.

- 16 -

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179, 1190 (Pa. 2010)].

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

>Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the orphans' court terminated Father's and Mother's parental rights to A.L.G., A.R.G., and M.M.G. pursuant to Sections 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze

the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's and Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, in terminating Father's parental rights, the orphans' court noted that Father has struggled with alcoholism for most of his life and at least as long as A.L.G. and A.R.G. have been alive. (Orphans' court opinions, 5/1/18 as to A.L.G. at 17; as to A.R.G. at 16; as to M.M.G. at 16.) Moreover, Father's alcoholism and his lack of motivation and/or inability to address same have

placed the Children at risk. Father has driven while intoxicated with the Children in the car. Additionally, Father's alcoholism has made him unable to retain employment and housing. Father's alcoholism has resulted in numerous evictions and $12,000 of landlord judgments entered against him. Although Father's alcoholism placed him at high risk of violating his parole and losing his Children, Father not only continued to consume alcohol, but his alcohol consumption has increased. Father consumed alcohol with Mother the night before the scheduled January 5, 2018 termination hearing to the point where Mother fell and struck her head, and as a result, Father and Mother did not attend the hearing. (*Id.* at 17-18; 16-17; and 16-17.) Father consumed alcohol the night before the scheduled February 22, 2018 termination hearing to the point where he appeared in court intoxicated and was taken into custody. (*Id.* 17-18; 17; and 17.)

With respect to the termination of Mother's parental rights, the orphans' court noted that she, too, has struggled with alcoholism for years. (*Id.* at 18; 17; and 17.) As previously stated, she consumed so much alcohol the night before the January 5, 2018 termination hearing that she fell and struck her head. (*Id.* at 17; 16; and 16.) Mother's drunken fall resulted in her need for emergency medical care and her inability to attend the termination hearing. (*Id.*)

In terminating Father's and Mother's parental rights to the Children, the orphans' court noted that Father and Mother have an enabling relationship.

(***Id.*** at 18; 17; and 17.) When Father and Mother are together – which is often – they drink alcohol together. Additionally, Father and Mother have failed to follow through with the Parents as Teachers Program; have failed to consistently attend Child's medical appointments; have failed to follow through with and complete their drug and alcohol treatment, but have continued to drink alcohol; have consistently failed to take reasonable steps to address the Children's medical and mental health needs; have neglected to sign necessary medical forms for approval of the Children's medical care; and have failed to attend the Children's medical and dental appointments. (***Id.***)

We conclude that the record supports the orphans' court's factual findings and that the orphans' court did not abuse its discretion in terminating Father's and Mother's parental rights to A.L.G., A.R.G., and M.M.G. under Section 2511(a)(2). The record demonstrates that the conditions that existed upon removal establish repeated and continued incapacity, abuse, neglect, or refusal of Father and Mother that caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. The record also supports the conclusion that Father and Mother continued to lack capacity to parent the Children.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The

emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love,

- 23 -

> comfort, security, and stability the child
> might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 73 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In determining that termination of Father's and Mother's parental rights favored A.L.G.'s and A.R.G.'s needs and welfare, the orphans' court noted its immediate concern that R.H.'s plans regarding the adoption of A.L.G. and A.R.G. are uncertain due to A.L.G.'s negative behaviors. (Orphans' court opinions, 5/1/18 as to A.L.G. at 19; as to A.R.G. at 18.) The orphans' court noted R.H.'s testimony that she has a very strong bond with A.L.G. and A.R.G. and that she intends to take all steps to assure that A.L.G. obtains the treatment and care that he needs even if she does not adopt A.L.G. R.H. indicated she would not abandon A.L.G. and A.R.G. and that she would assist CYS in finding an adoptive home for A.L.G. and A.R.G. (*Id.*)

The orphans' court balanced the uncertainty of R.H.'s adoption of A.L.G. and A.R.G. against the alternative of not granting the involuntary termination petition. (*Id.* as to A.L.G. at 19; as to A.R.G. at 18.) Although the orphans' court noted that A.L.G. and A.R.G. recognize Mother and Father and enjoy spending time with them, the orphans' court concluded that it is unlikely that Mother and Father will address their alcoholism. (*Id.* as to A.R.G. at 19; as to A.R.G. at 18.) The orphans' court found that if it did not grant the termination petitions, it would be less likely that A.L.G. and A.R.G. would be adopted in the future, either by R.H. or another family, because they would be caught in an "in-between world where [A.L.G. and A.R.G. know their] Parents and enjoy[] their visits but cannot be in their care" which will likely be troubling for A.L.G. and A.R.G. (*Id.* as to A.L.G. at 19; as to A.R.G. at 19.) The orphans' court concluded that because there exists a much greater potential for A.L.G. and A.R.G. to obtain permanency if parental rights are terminated, termination would "best fulfill [Child's] 'developmental, physical and emotional needs and welfare.'" (*Id.* as to A.L.G. at 20; as to A.R.G. at 19.) Our review of the record supports the orphans' court's determination, and the orphans' court did not abuse its discretion in terminating Father's and Mother's parental rights to A.L.G. and A.R.G.

In determining that termination of Father's and Mother's parental rights favored M.M.G.'s needs and welfare, the orphans' court noted that although M.M.G. has a bond with Father and Mother, that bond has been more

destructive than beneficial to M.M.G. (Orphans' court opinion, 5/1/18 as to M.M.G. at 18.) The orphans' court further noted that M.M.G. has "received extensive mental health treatment and is in great need of stability." The orphans' court determined that M.M.G.'s foster parents provide her with the stability that she needs, which has improved M.M.G.'s anxiety and mental health concerns. Accordingly, the orphans' court concluded that severing M.M.G.'s bond with Father and Mother would "still best fulfill [M.M.G.'s] 'developmental, physical, and emotional needs and welfare.'" (**Id.**) Our review of the record supports the orphans' court's determination, and the orphans' court did not abuse its discretion in terminating Father's and Mother's parental rights to M.M.G.

Based upon our review of the record, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Father's and Mother's parental rights to A.L.G., A.R.G., and M.M.G. under Sections 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/24/2018

- 26 -

J. S58042/18 & J. S58043/18